UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                       :
MICHAEL BUTLER                  :             3:13 CV 607 (JGM)
                                         :
V.                                     :
                                         :
CAROLYN W. COLVIN            :
ACTING COMMISSIONER OF SOCIAL   :
SECURITY                      :          DATE: NOVEMBER 18, 2014
                                         :
------------------------------------------------------ x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, AND DEFENDANT'S MOTION FOR ORDER
AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g)
and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of
Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and
Supplemental Security Income ["SSI"] benefits.

I. ADMINISTRATIVE PROCEEDINGS

On March 12, 2009, plaintiff, Michael Butler, applied for DIB and SSI (Certified
Transcript of Administrative Proceedings, dated June 1, 2013 ["Tr."] 180-88, 189-92)
claiming that he was disabled due to "major depressive disorder and bipolar type b[,]"
commencing on August 31, 2008.  (Tr. 216; see also Tr. 354). Plaintiff's application was
denied initially (Tr. 73-76; see also Tr. 77-79), and upon reconsideration. (Tr. 83-85). On
July 12, 2010, plaintiff filed a request for a hearing by an Administrative Law Judge
["ALJ"] (Tr. 88-90; see also Tr. 91-94, 108-11, 115-17, 127-41, 148-68, 170-78), and on
August 29, 2011, a hearing was held before ALJ James Thomas, at which plaintiff and

vocational expert ["VE"] Renee Jubree testified. (Tr. 25-56; see also Tr. 170-71).[1] On September 19, 2011, ALJ Thomas issued a decision denying plaintiff DIB or SSI benefits. (Tr. 9-20). On October 5, 2011, plaintiff requested a review of the hearing decision (Tr. 7-8, 260-61), which the Appeals Council denied on February 26, 2013, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On April 26, 2013, plaintiff filed his complaint in this pending action (Dkt. #1), and on December 23, 2013, defendant filed her answer. (Dkt. #6). On April 30, 2014, plaintiff filed his Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing and brief in support (Dkt. #16), which was followed by defendant's Motion to Affirm the Decision of the Commissioner and brief in support (Dkt. #19), and plaintiff's response to defendant's Motion to Affirm (Dkt. #22).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing (Dkt. #16) is granted in part such that the case is remanded for further proceedings consistent with this Recommended Ruling, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is denied in large part but is granted in limited part.

## II. FACTUAL BACKGROUND

### A. HEARING TESTIMONY AND ACTIVITIES OF DAILY LIVING

Plaintiff was born in 1969 (Tr. 28, 180, 189), and thus is forty-five years old. Plaintiff did not finish high school but earned a GED while serving time in prison. (Tr. 28, 37, 220, 266, 328).

---

[1] Plaintiff was represented by counsel at the administrative level and on this appeal. (Tr. 25, 86; see also Tr. 12, 87).

Plaintiff completed a Function Report on April 16, 2009 (Tr. 233-40), in which he claimed that he is able to "do house chores, [] take care of [his] two boys, [and] do yard work" (Tr. 233) and that he can "clean, do laundry, [and] rake [and] mow [the] lawn" but that it   takes him awhile to do these tasks because he "sometimes [] need[s] to be reminded" and because he gets "easily side tracked and do[esn't] finish what [he is] doing[.]" (Tr. 235). He claimed that he is able to clean, bathe, and cook for his children as well as feed the household's pets, but that he receives help from family and friends to take care of his children and that his conditions make it difficult for him to "pay attention and concentrate on [the] task at hand[.]" (Tr. 234). He also reported difficulty sleeping because he stays up all night thinking and talking to himself. (Id.). He claimed that he sometimes needs reminders to take his medicine but that he is able to prepare simple meals, such as sandwiches and frozen dinners, on a daily basis. (Tr. 235). He stated that he goes outside every day and that he can travel by walking, riding in a car, or riding a bicycle, but is not able to drive himself because he "can't get a license[.]" (Tr. 236).  He claimed that he is able to shop for "clothes, food and whatever [he] need[s]" but that due to his past problems with drugs and alcohol that he needs help managing money and is not able to pay bills, handle a savings account, or use a checkbook/money order. (Id.). He reported that his only hobby is watching television, which he does "all of the time[,]" that he has no social activities, and that he does not follow written or spoken instructions. (Tr. 237-38). He claimed that he does not handle stress or changes in routine well and he does not get along with authority figures such as police, bosses, landlords, or teachers, and has been fired because he does not "get along with anyone." (Tr. 239).

3

Plaintiff's girlfriend,[2] who is the mother of two of his children,[3] completed a Function Report regarding plaintiff in April 2009 (Tr. 222-29), in which she stated that he is able to babysit his children, do household chores, "such as garbage[,]" care for his grandmother, and "feed fish[.]" (Tr. 223). However, she also noted that he often receives assistance in performing these tasks from "friends and whomever is around at the time[.]" (Id.). She also claimed that he is unable to sleep without medication and that he "[s]ometimes goes days without showering and forgets to take medications sometimes[.]" (Tr. 224). She added that he is able to prepare simple meals, such as sandwiches, cereal, and frozen dinners on a daily basis and can do chores, such as garbage and laundry, but that he may need "reminders and motivation" to complete these tasks. (Id.). She also noted that plaintiff does not do house or yard work because he "gets sidetracked and his condition makes him tired[,]" that he has someone else shop for him, and that he is not responsible enough to pay bills, handle a savings account, or use a checkbook/money orders. (Tr. 225). She claimed that his hobbies include "watching TV, playing chess/ cards, fishing, [and] spending time with his children" and that he engages in these hobbies weekly. (Tr. 226). She wrote that his only social activity is playing with his children and that, other than medical appointments, he "doesn't go places[.]" (Id.). She noted that he "has an issue with being social and gets irritated very quickly with society" and he has similar issues getting along with authority figures such as police, bosses, or landlords which caused him to lose his job with Wyman Construction because he "argued

---

[2]The record refers to this woman at different times as plaintiff's friend (Tr. 222), girlfriend (Tr. 30, 36, 278, 279, 283, 301, 302), fiancée (Tr. 30, 270), and wife (Tr. 268, 269, 279, 280, 281, 284).  For the sake of consistency, this Recommended Ruling will refer to her as plaintiff's girlfriend.

[3]Plaintiff has a total of four children.  (Tr. 267, 301-02, 376).

with bosses and co-workers." (Tr. 227-28). She observed that he has "expressed suicidal thoughts" as well as "[p]aranoia towards authority, going back to jail, and society" and "anxiety, severe depression, and major mood swings." (Tr. 228-29). She claimed that his medications "seem to help some of the symp[t]oms sometimes[]" but that if he ever misses taking his medication he becomes "very moody and at times angry." (Tr. 229). She concluded with the observation that plaintiff "cannot deal with the public[,] he gets severe anxiety, and then sometimes it turns into panic attacks." (Id.).

Plaintiff testified before ALJ Thomas on August 29, 2011. (Tr. 27-46). Plaintiff estimated that he has spent between ten to eleven years in prison due to "[f]ighting" (Tr. 32-33), but later clarified that his last assault conviction was in 1998 and since then his criminal record consists of "property offenses and motor vehicle offenses." (Tr. 41). Plaintiff testified that he has not remained in a single job for longer than three months, and his longest employment was with Precision Molding where he would "sit there and watch the machine . . . once the materials got done [he would] fill the material bin back up." (Tr. 44). He was not working at the time of the hearing (Tr. 30), and his last job was working at Berkshire Products for "[a] couple months" before leaving because of "either getting in a[n] argument with one of [his] coworkers or fighting with [his] boss. [He] believe[s] that [in this instance, the cause was] fighting with [his] boss." (Tr. 31; see also Tr. 44-45). Before that, he worked at Talon Lumber in 2004-05 "stacking wood" and is not sure if he either quit that job or left due to arguing. (Tr. 31-32; see also Tr. 217). Plaintiff also did construction work "[j]ust for a couple of months to hold [his] parole off[]" and does not remember why he left that job. (Tr. 32). Prior to that, he worked at Berkshire

Precision Molding where he believes his job was "running machines" and he does not remember why he left that position. (Id.; see also Tr. 196-210).[4]

Plaintiff has a history of drug problems, testifying that he "used to smoke marijuana, cocaine, [and] crack, [and abuse] alcohol. [Also, he] did LSD." (Tr. 33). He claims to have not used alcohol or drugs since going into custody in August 2008, except for briefly using marijuana to "keep [him] calm" when he did not yet have his medications. (Tr. 33-34). Plaintiff concedes that he has issues with anger and that in the past he would get into "a lot of fights." (Tr. 37). However, he took an anger management class while in prison, as well as a relapse prevention course, and believes that this course has helped with his anger issues. (Tr. 37, 41). He believes that the combination of his anger issues and his alcohol and drug use caused him to have problems keeping a job because the drinking and drugs would lead to "being late and not showing up[]" which would then lead to arguments with his boss or coworkers. (Tr. 43-44).

Plaintiff lives with his girlfriend and their two young children. (Tr. 30-31). He is in treatment at the Northwest Center for Family Services for major depressive disorder, bipolar disorder, and a social phobia disorder. (Tr. 34-35). He sees his therapist once a week and his doctor once every four to six weeks. (Tr. 35). At the time of the hearing, plaintiff testified that he was taking Seroquel, Depakote, Celexa, and Hydroxyzine (id.), and that being on these medications helps him a little bit, but that he still has suicidal thoughts "every now and then[.]" (Tr. 36). Plaintiff claimed that his depression causes him to stay in his room and watch TV for most of the day.  (Id.; see also Tr. 40). He testified that he has no ambition to do anything and "can't even go out in public to eat

---

[4]This appears to be the same position that plaintiff claims he maintained for the longest period of time. (See Tr. 44).

[or] go to stores[.]"  (Tr. 36). He has been with his girlfriend for ten years and she has been taking care of him for the same length of time.  (Id.). He explained that he almost never leaves his home except to go to see doctors and that he sometimes misses those appointments due to a lack of "ambition[]" but that he will make up any appointments that he misses with his therapist. (Tr. 38). He claimed to have trouble concentrating because his mind "is always racing to so many different things." (Id.; see also Tr. 234). He also claimed to have had a troubled childhood including problems with his "mom, drugs[,] physical [and] mental abuse[]" and to have been molested by his mother's friends when he was younger but without realizing that it was against the law. (Tr. 38-39).

Plaintiff testified that he has no social life and no friends except for his siblings and cousins who will come to his house to "check on [him] sometimes[.]" (Tr. 39). He testified that he does not want to leave the house because he gets nervous and "shaky[]" and because he wants to avoid any interactions that could result in him being sent back to prison. (Id.). He explained that he will do household chores "[e]very once in a while" but that his girlfriend does the cooking, dishes, and grocery shopping. (Tr. 39-40).   He testified that he will sometimes take his children to a nearby park, but if other people are there, he will leave and go home. (Tr. 40).

VE Renee Jubree also testified at plaintiff's hearing (Tr. 46-55); she found that plaintiff's prior work experience varied in exertional levels but consisted entirely of unskilled labor. (Tr. 47). She testified that plaintiff's work at Precision Molding would be considered an injection molding machine tender, a position involving light, unskilled work. (Id.). She also concluded that a hypothetical individual with claimant's educational and

vocational background who is limited to unskilled jobs defined as those involving simple, routine, repetitive tasks with short, simple instructions and few workplace changes, who is further limited to occasional superficial interactions with coworkers, defined as no teamwork or coordinated job efforts required, and who is not capable of performing high-paced production demands would still be able to work as an injection molding machine tender. (Id.). VE Jubree also testified that if the same individual was further limited to frequent, but not continuous, contact with a supervisor that he would still be able to perform this work as well as the work of a folder, a marker, and a laundry worker I. (Tr. 47-49, 51-55). However, if the same individual was further limited to no contact with coworkers, then no jobs would be available that he could perform. (Tr. 49-50). Similarly, a restriction that the hypothetical individual would have to miss two days of work each month would rule out all jobs. (Tr. 50).

B. MEDICAL RECORDS

Prior to the alleged onset date, plaintiff was screened at the Berkshire County Sheriff's Office, Jail and House of Corrections on August 29, 2008 (Tr. 285-86), where it was noted that plaintiff was experiencing anxiety and depression but that he was "[n]ot as angry as much as he used to be." (Tr. 285). This screening also observed that plaintiff had experienced suicidal thoughts in the past and that he "seem[ed] a bit depressed" with a flat affect but these conditions "could be situational--maybe not." (Tr. 285-86; see also Tr. 266). After this initial screening, plaintiff was treated at the Berkshire County House of Corrections from September 4, 2008 through January 22, 2009. (Tr. 263-327). Plaintiff underwent a Mental Health Assessment on October 28, 2008 with Cynthia Pinsky, LICSW, where he displayed symptoms of depression, anger, decreased sleep, decreased appetite,

8

and a history of substance abuse. (Tr. 267). He was diagnosed as having major depressive disorder, alcohol abuse, and polysubstance dependence. (Id.). During this original assessment, Social Worker Pinsky noted that plaintiff had a troubled childhood, a history of being incarcerated for assaults and Operating Under the Influence of liquor, and a long history of substance abuse starting in his teens. (Id.). She also observed that plaintiff had a "vague suicidal ideation[,]" as well as "several suicide attempts, mainly by overdosing on drugs." (Id.). Plaintiff commented that "if he weren't incarcerated[,] he [would] have killed himself." (Id.).

Plaintiff's Progress Notes begin on September 4, 2008 when plaintiff reported difficulty sleeping and was noted to be "[a]gitated, irritable, anxious, tearful. Having [suicidal ideation] - no intent -currently not at risk." (Tr. 271). It was also noted that he had never taken medication before and had been using marijuana to self-medicate for his anxiety and sleeping problems. (Id.). Plaintiff was seen again four days later for the same reasons and there was "[n]o change in [his] mental status." (Id.). On September 12, 2008, plaintiff was prescribed Elavil to help with his conditions. (Tr. 270). On October 28, 2008, plaintiff requested to speak with Social Worker Pinsky because of decreased sleep, decreased appetite, and feeling overwhelmed with his family issues. (Id.). She noted that he "appeare[d] very depressed and sad. Ha[d] an angry look on his face." (Id.). On November 11, 2008, Pinsky noted that plaintiff was doing well in multiple groups and that his "motivation level [was] high." (Tr. 269). However, at his November 24, 2008 appointment with Pinsky, plaintiff reported increased depression, irritability, compulsive thoughts, and angry feelings, which resulted in vague suicidal ideations. (Id.). She observed that plaintiff "appeared effectively overwhelmed and ha[d] little capacity to cope

at this time. Some of this [was] in response to issues w[ith his girlfriend] but [plaintiff] does have a history of depression." (<u>Id.</u>). On November 28, 2008, plaintiff met again with Pinsky because of his flat affect and depression. (Tr. 268). He reported "feeling very depressed in response to his [girlfriend] breaking up with him" and that he was "feeling very overwhelmed, not sleeping and if he were on the outside he would have killed himself[.]" (<u>Id.</u>). Pinsky noted that plaintiff looked "very tired, sad, and depressed" but found that he did not pose a risk to himself at the time. (<u>Id.</u>). Plaintiff was seen again the next day by Dana van Slycke, MSW, who found him to be "[d]ysphoric to [d]epressed" about his family situation but a low risk for self harm. (<u>Id.</u>, Tr. 284).

On December 1, 2008, Social Worker Pinsky followed up with plaintiff, who continued to report poor sleeping, depression, and feelings of hopelessness and guilt. (Tr. 284). He had been encouraged by the fact that his girlfriend had visited him over the weekend, even though they had not reconciled. (<u>Id.</u>). Pinsky found that plaintiff still had suicidal ideation but without a plan, and that he looked depressed and was struggling with coping with his situation. (<u>Id.</u>). She stated that plaintiff should be monitored and that his medications should be evaluated. (<u>Id.</u>). Plaintiff's Elavil dosage was increased on December 4, 2008 and he met with Pinsky again on December 9, 2008. (Tr. 283). At this appointment, she still found him to be depressed and anxious and found that these conditions had become worse because plaintiff's girlfriend had not come to visit him the previous weekend and because he had an upcoming court date. (<u>Id.</u>). She noted that plaintiff tried to manage his anxiety by increasing his level of activity. (<u>Id.</u>). On December 16, 2008, plaintiff's Elavil dosage was decreased because of problems with his liver enzymes. (Tr. 282). On December 18, 2008, it was noted that plaintiff was "[d]oing well

in groups[,]" but he reported that he was feeling depressed and had been sleeping poorly since the reduction of his Elavil, which he believed had been helping him. (Id.). On December 22, 2008, plaintiff continued to complain of poor sleeping and continued to be "very focused on his relationship with his [girlfriend] and what would happen if she left him." (Tr. 281). Plaintiff's medications were altered on December 26, 2008 in an attempt to "provide some relief[.]" (Id.). Plaintiff was seen again on December 30, 2008, with the same symptoms of poor sleep and depression, at which appointment he was encouraged to find self-worth and a reason for living outside of his relationship with his girlfriend. (Tr. 280).

On January 6, 2009, plaintiff continued to report the same problems with sleeping which were increasing his depression and anxiety and resulting in him sleeping through group discussions. (Id.). On January 12, 2009, plaintiff's medications were evaluated and remained the same. (Tr. 279). The next day, plaintiff reported decreased sleep and increased worry accompanied by "ruminative thinking." (Id.). Plaintiff was trying to manage these conditions by journaling, participating in groups sporadically, and working less. (Id.). Social Worker Pinsky noted that plaintiff had decreased functioning, and appeared to be more depressed, more hopeless, and more at risk for suicide. (Id.). On January 23, 2009, plaintiff reported that an increase in his Trazodone prescription was helping a little; however, it was noted that he continued to look tired and depressed. (Tr. 278). Plaintiff was seen for the last time at the Berkshire County House of Corrections on January 28, 2009. (Id.). At the time, he reported that he was still not sleeping well but was observed to be less depressed and did not report any suicidal ideation. (Id.). This increase in mood was attributed to that fact that plaintiff was soon to be released from

11

custody and that his girlfriend had agreed to allow him to return home with her. (Id.). He was encouraged to develop a wider support group in case problems arose in this relationship. (Id.).

As his release neared, plaintiff underwent a Psychiatric Evaluation with Jerry L. Carter, M.D. on December 4, 2008. (Tr. 301-02).  Dr. Carter noted plaintiff's history with alcohol and drugs and how these problems have contributed to his numerous incarcerations. (Tr. 302). Dr. Carter observed that plaintiff "is seen as being extremely depressed[,]" was "prescribed Amytriptilin 200mg POQHS with minimal benefit[,]" and "has expressed suicidal ideation indicating that if he were not in [custody] he probably would have killed himself by now." (Id.). In this evaluation, plaintiff expanded upon his past, reporting that he has been depressed since he was sixteen or seventeen, that both of his parents had substance abuse problems, and that he was raised mostly by his grandmother. (Id.). He began using drugs and alcohol as a teenager and was kicked out of high school. (Id.). He reported that "he has attempted to kill himself by overdosing on drugs a couple of times." (Id.). He claimed that his sleeping problems occur because "he lays awake at night holding full conversations with himself in his head[,]" but that he has not undergone any previous psychiatric evaluation or treatment for depression. (Id.). He has worked on improving his anger management problems and will no longer become physical "unless someone puts their hands on him, threatens his kids or his girlfriend, etc." (Id.) He also underwent twelve weeks of substance abuse aftercare as well as attending some Alcoholics Anonymous and Narcotics Anonymous meetings. (Tr. 301). Dr. Carter found plaintiff to be "unhappy appearing" but noted that he made fair eye contact, was talkative, alert and oriented, had intact attention and memory, coherent and goal

directed speech without evidence of formal thought disorder or delusions, no evidence of hallucinations, average to below average intellect, and insight and judgment that were grossly intact. (Id.). Dr. Carter found plaintiff to suffer from "chronic low grade depression, most consistent with the diagnosis of dysthymic disorder." (Id.).  However, he noted that "[t]here clearly seems to be a strong characterologic component to this[,]" and that his description of being unhappy at times in his life "related to ongoing situational factors, as well as his substance dependence and related consequences." (Id.). He observed that plaintiff had "limited coping skills" and additionally diagnosed him as suffering from "[a]nxiety disorder not otherwise specified[,]" "[a]lcohol dependence[,]" and "[o]ther polysubstance abuse versus dependence." (Id.). He recommended that plaintiff's dosage of Amytriptilin be increased and if he continued to be depressed to add either Paxil, Zoloft, or Celexa. (Id.).

Dr. Carter held a follow-up appointment with plaintiff on January 22, 2009, shortly before he was released on January 31, 2009. (Tr. 303-04). Dr. Carter reiterated that plaintiff had a "long standing history of depressive symptoms with [a] strong characteralogic component[]" and that he was "very negative and pessimistic[]" and "very dependent in his relationship with his girlfriend." (Tr. 304). Dr. Carter learned that, upon his previous recommendation, plaintiff's Amytriptilin dosage had been increased and plaintiff reported sleeping "pretty well with that[,]" but the medication had since been discontinued completely because of a "super therapeutic Amytriptilin level which remained elevated even when the dose was decreased down to 150 mg PO QHS." (Id.). Plaintiff had been switched to Trazodone and Celexa but was "dissatisfied with his current medication regiment[,]" and would lie awake at night worrying. (Id.). Dr. Carter noted that there has

been "increasing concern" about plaintiff's suicide risk, even though he "denie[d] current suicide plans," and opined that at that time he was "not seen as being so much depressed at this point as much as worried and upset about ongoing issues with his girlfriend, what will happen when he is released, etc." (Id.). Dr. Carter also noted that plaintiff "wore a very sad and pessimistic expression" as he approached the office for the interview and Dr. Carter "was left wondering if part of this expression was to impress me with how depressed he is." (Tr. 303-04). Dr. Carter repeated his belief that plaintiff had an "[a]nxiety disorder not otherwise specified[,]" "[a]lcohol dependence[,]" and "[o]ther polysubstance abuse versus dependence[,]" but revised his diagnosis of "chronic low grade depression" to "[l]ikely dysthymic disorder with components of adjustment disorder with depressed mood and a fairly strong characteralogic component to his chronic depression" and added that he "believe[d] [plaintiff] poses a chronic suicide risk at the present time[,]" a risk that was largely dependent on whether plaintiff's relationship with his girlfriend worked out. (Compare Tr. 301 with Tr. 303). Dr. Carter recommended altering plaintiff's medication to help him sleep at night and noted that he "clearly need[ed] outpatient psychiatric follow-up[.]" (Tr. 303).

While incarcerated, plaintiff was also diagnosed with Hepatitis C (Tr. 312), refused dental care (Tr. 315), tested negative for HIV (Tr. 316-17), and was vaccinated for Hepatitis A and B. (Tr. 319-20).

Plaintiff is taking or has taken Buspar, Celexa, Depakote ER, Seroquel, Elavil/Amytriptilin, and Trazodone. (Tr. 253, 258, 304, 310-11).

After being released from custody, plaintiff was seen at the Brien Center for Mental Health and Substance Abuse Services on February 5, 2009. (Tr. 328-31). Plaintiff's initial

14

assessment noted that he would begin Alcoholics Anonymous and Narcotics Anonymous the following week, that he had a history of multiple suicide attempts by overdosing on cocaine but was currently a low risk for suicide, and that he had a history of assault, committing domestic abuse and being abused, but that he was currently a low risk for violence. (Tr. 328). Plaintiff's mental status exam revealed abnormal changes in sleeping pattern and appetite, abnormal memory, cognitive functioning, thought process and mood/affect, and poor judgment in the past. (Tr. 329). He was diagnosed with a mood disorder, not otherwise specified, polysubstance dependence, and post traumatic stress disorder, and was seeking medication for anxiety and depression. (Id.). On February 6, 2009, it was noted that plaintiff had attended an Alcoholics Anonymous meeting but that he did not have a sponsor yet. (Tr. 331). Plaintiff called to cancel his appointment on February 16, 2009 due to problems with transportation, and did not call or show up for his appointment on February 24, 2009. (Id.).

Plaintiff was next seen at the South County Psychiatric and Psychotherapy Center on April 8, 2009, by Alice Berke, LICSW. (Tr. 376-77). Plaintiff shared his history of growing up in an abusive situation, his problems with drugs and alcohol, and his multiple incarcerations. (Tr. 376). Social Worker Berke found that plaintiff suffered from post traumatic stress disorder, polysubstance abuse in remission, major depressive disorder, recurrent anxiety disorder without agoraphobia, "[rule out] [b]ipolar [d]isorder[,]" and "[rule out] [p]ersonality [d]isorder, [not otherwise specified.]" (Tr. 377). On a one to ten scale of severity, Berke found plaintiff's polysubstance abuse to be a nine and his depression and anxiety to each be an eight; she also assigned him a Global Assessment of Functioning ["GAF"] score of 55. (Id.). She recommended that plaintiff receive weekly

15

individual psychotherapy sessions, and meet with a medical doctor to discuss his medications. (Id.). Plaintiff met with Richard Plotkin, M.D., on April 30 and June 23, 2009, and was diagnosed both times with a depressive disorder, not otherwise specified, polysubstance dependence, in remission, and personality disorder, not otherwise specified; at both meetings Dr. Plotkin increased plaintiff's dosage of Celexa and Seroquel and recommended that he continue his current psychotherapy work. (Tr. 379-80).

Plaintiff was seen by Social Worker Berke on April 15, April 22, May 6, May 13, May 20, May 27, June 10, July 1, July 8, and July 15, 2009.  (Tr. 378, 381-83). He missed or canceled appointments on April 29, June 3, June 17, June 23, and August 19, 2009. (Id.). Plaintiff presented with depression at every appointment that he attended and presented with anxiety at all appointments he attended except those on July 1, July 8, and July 15. (Id.). On May 6 and May 20, 2009, plaintiff reported that his medications were helping him sleep. (Tr. 378, 381). On July 1, plaintiff's depression was considered "severe" but this condition was attributed to the fact that plaintiff was out of his medications. (Tr. 382). On July 18, 2009, plaintiff reported that he had been taken by state police to a hospital on July 15 because of his agitation, from losing his prescription, but was provided with medication at the hospital Emergency Room. (Tr. 383).  He further reported having suicidal ideations when he was taken to the hospital but that he no longer did. (Id.).

Plaintiff began treatment at the Community Mental Health Affiliates, Inc. ["CMHA"], on October 23, 2009, with Christine Barvoets, M. Ed. (Tr. 369; see also Tr. 371). On that day, he was diagnosed with bipolar disorder and post traumatic stress disorder and it was noted that he had a sad mood and affect but he was oriented and

exhibited cooperative behavior. (Tr. 369). Plaintiff was seen again on October 30, 2009 and was found to have the same sad affect and depressed mood, but to still be oriented and cooperative. (Tr. 368). He reported being "upset/frustrated w[ith] health concerns" and "feel[ing] numb[.]" (Id.). Plaintiff was next seen on November 13, 2009, and was diagnosed with major depression. (Tr. 367). It was noted that he had increased irritability and decreased motivation and he reported to be struggling with increasing symptoms of depression. (Id.). On the same day, plaintiff participated in the development of a recovery plan. (Tr. 370-71). After being diagnosed with major depressive disorder and assigned a GAF of 45 (Tr. 371), he set goals to decrease his symptoms of depression, his irritability, and his social phobia and to increase his motivation. (Tr. 370). He noted that his strengths included being a father and being helpful. (Id.). Plaintiff did not show up for his appointment on November 30, 2009. (Tr. 366). Plaintiff was seen on December 18, 2009, with a continued diagnosis of major depression, with no change in his level of irritability, motivation, or social phobia. (Tr. 365). He reported improved relations at home with his girlfriend but that he was experiencing financial strain. (Id.). Plaintiff rescheduled his appointment that was originally set for January 4, 2010, and at his appointment to manage his medications on January 8, 2010, plaintiff was still diagnosed with major depression and his medications were adjusted. (Tr. 363-64). Plaintiff did not show up for his appointment on January 12, 2010, but on February 4, 2010, Marietta Whittlesey, MS, diagnosed him with post traumatic stress disorder and major depression and found no changes in his irritability, motivation, or social phobia, by. (Tr. 361-62).

On June 4, 2010, plaintiff attended a therapy session with Whittlesey, where it was noted that his depression was "up and down" and that, while he "live[d] surrounded by

family[,]" he still had problems isolating himself because of his fear of his volatile temper and desire to stay out of trouble. (Tr. 405).  He also reported that his medications were allowing him to sleep well. (Id.).  On June 24, 2010, plaintiff reported feeling bad because his daughter did not contact him on Father's Day or his birthday; Whittlesey added a diagnosis of social phobia based off plaintiff's history. (Tr. 406).[5] On August 17, 2010, plaintiff reported that he had recently been hospitalized for a relapse of his back pain, that his depression was not much better, but that his sleep had been better "except for recent hot nights." (Tr. 407). He reported that he was still having problems with Social Phobia which caused him to isolate himself, feel paranoid around people, and prematurely leave his brother's wedding. (Id.). He reported that he had not been drinking and that he had significantly reduced his use of marijuana at his lawyer's suggestion. (Id.). On August 30, 2010, plaintiff stated that some of his medications were helping with his depression and irritability and that some of his treatment objectives such as improving his sleep and decreasing his negative thoughts had been "partially achieved." (Tr. 408). Plaintiff canceled his appointment on September 21, 2010 due to a death in his family and did not show for his appointment on October 14, 2010. (Tr. 409-10). Plaintiff's therapist called at plaintiff's request on October 25, 2010 and plaintiff reported that he was "very depressed." (Tr. 411). At plaintiff's appointment on November 9, 2010, he was found to be "[e]xtremely depressed[,]" and reported that he had recently taken his family out to dinner for the first time in years and ended up getting into a fight with someone "who he thought was staring at him[.]" (Tr. 412). He stated that he "wants to end it" and "wants

---

[5]Plaintiff's social phobia had previously been noted, and treated, as a symptom of his depression (Tr. 370), however, it had not formally been diagnosed as a separate condition. (Tr. 406, 387).

18

to die," but had "no specific plan[;]" he agreed to call his therapist or a suicide hotline if he became suicidal. (Id.). On November 16, 2010, plaintiff's therapist, Licensed Marriage and Family Therapist Geoffrey Gott, noted that his affect was "depressed[,]" his mood was "depressed/hopeless[,]" and that, while his mood had stabilized, he still experienced uncontrollable anger for perceived threats or insults in social situations. (Tr. 413). Plaintiff was "[m]otivated but lacking hope [and] patience." (Id.). On December 7, 2010, Gott noted that plaintiff had been "[h]ard to reach initially [but has] become able to ask for appropriate help[;]" however, his mood was still depressed. (Tr. 414). On March 18, 2011, plaintiff reported to Whittlesey that he was "[v]ery afraid of the end of the world" because of the recent tsunamis and earthquakes. (Tr. 415). Whittlesey found him to be very engaged, talkative, and perceptive on that day, and they discussed the time plaintiff overheard his mother say that he was a mistake. (Id.). On May 13, 2011, plaintiff was very stressed because his landlord wanted his family to move (Tr. 416); however, one week later, this situation had been resolved and his anxiety decreased. (Tr. 417). On May 27, 2011, plaintiff reported to Whittlesey that attending counseling had kept him out of prison. (Tr. 418).

Plaintiff participated with Whittlesey in updating his recovery plan on May 21, 2010, to deal with his continuing major depressive disorder and the new condition of social phobia. (Tr. 386-87). At the time, plaintiff was assigned a GAF of 45 and it was noted that his lack of access to transportation was a barrier to his treatment. (Tr. 387). Plaintiff's updated goals included continuing to try to reduce the symptoms of his depression, to dislike life only three days per week instead of every day, to experience no more suicidal ideation rather than experiencing it four days of the week, to experience

decreased motivation and sleep problems only three days a week rather than every day, to experience racing negative thoughts and isolation only four days of the week rather than every day, and to experience irritability only two days of the week instead of five days. (Tr. 386).

Plaintiff updated his recovery plan with Whittlesey again on August 31, 2010, to deal with the continued issues of major depressive disorder and social phobia. (Tr. 390-91). He was again assigned a GAF of 45 and "malingering" was added as another barrier to his treatment, along with his lack of transportation. (Tr. 390). Plaintiff's updated goals included continuing to try to reduce the symptoms of his depression, to experience no suicidal ideation rather than experiencing it one to two days a week, to experience irritability three days a week rather than six or seven, and to try to do something meaningful for himself or his family at least once a day. (Tr. 391).

Plaintiff attended additional appointments with Dr. Sabooh Mubbashar to manage his medications on June 25, 2010, July 23, 2010, September 24, 2010, March 11, 2011, and May 13, 2011. (Tr. 392, 393, 396, 401, 404). He did not show up to or canceled appointments on September 3, 2010, September 17, 2010, October 29, 2010, November 12, 2010, December 10, 2010, January 7, 2011, April 1, 2011, and April 15, 2011. (Tr. 394, 395, 397, 398, 399, 400, 402, 403). Plaintiff was diagnosed with bipolar manic disorder or major depression at every appointment he attended. (Tr. 392, 393, 396, 401, 404). Plaintiff was instructed to begin taking Celexa again on June 25, 2010 (Tr. 392), and his dosage of Celexa was increased on September 24, 2010. (Tr. 396).

## C. DISABILITY DETERMINATION RECORDS

Plaintiff underwent a consultative examination with Margaret Stephenson, Ph.D., on June 24, 2009. (Tr. 337-41). Plaintiff informed Dr. Stephenson of his abusive childhood, his educational and vocational history, his history with drugs and alcohol, and his "suicidal gesture in 1993 when he attempted to overdose on substances[.]" (Tr. 337-38). He informed her that he was then admitted to the Doyle Center for detoxification, that he had completed an eight week alcohol program while incarcerated, and that he is "currently receiving outpatient treatment weekly and is prescribed Seroquel and citalopram." (Tr. 337). He also provided Dr. Stephenson with a detailed explanation of his symptoms.

> [Plaintiff] reported dysphoric mood, psychomotor retardation, crying spells, feelings of guilt and hopelessness, loss of usual interests, irritability, psychomotor agitation, loss of energy, feelings of worthlessness and diminished self-esteem, difficulty concentrating, and social withdrawal. He denied suicidal ideation. He also reported anxiety symptoms that included irritability, nightmares about people coming after him, hyperstartle response, restlessness, muscle tension, flashbacks where he sees himself getting hurt, getting stabbed in the face, and . . . hurting other people. He also reported hypervigilance, and explosive behavior and agitation when he perceives a threat of harm or violence. [Plaintiff] reported panic symptoms that occur every time he is in a crowded place with the last episode having occurred three days prior to the evaluation. His symptoms included palpitations, sweating, dizziness, difficulty breathing, trembling, fear of losing control, and chest pressure. He also reported manic symptoms that included grandiosity, pressured speech, distractability, psychomotor agitation, and excessive involvement in pleasurable activities, such as excessive drug use or spending money that he does not have, decreased need for sleep, flight of ideas, increased goal-directed activities, and elevated mood. He reported cycling at least weekly, with the last episode having occurred three days prior to the evaluation.

(Tr. 338-39). Dr. Stephenson's evaluation found that plaintiff was oriented to person, place, date, and time, and he scored in the average range on tests to measure attention, language comprehension, repetition, naming, memory, calculations, reasoning,

21

similarities, and judgment. (Tr. 339).  She diagnosed plaintiff with bipolar disorder, post

traumatic stress disorder, and polysubstance use, in remission, and assigned him a GAF of

50. (Tr. 340). She opined that plaintiff would "have difficulty obtaining and maintaining

employment[,]" and that "he may require a payee to help handle his benefits." (Tr. 339-

40).

On July 2, 2009, Jon Perlman, Ed.D, competed a Psychiatric Review Technique

that analyzed plaintiff under Listing 12.04 for Affective Disorders, Listing 12.06 for Anxiety

-Related Disorders, and Listing 12.09 for Substance Addiction Disorders. (Tr. 342-55).  He

found that plaintiff suffers from mild restrictions of activities of daily living, moderate

difficulties in maintaining social functioning, concentration, persistence, or pace, and no

episodes of decompensation of extended duration. (Tr. 352). He concluded that plaintiff's

claims of depression and bipolar disorder are credible but not severe enough to meet a

listing. (Tr. 354).

On January 14, 2010, Lawrence Langer, Ph.D., completed a Mental Residual

Functional Capacity Assessment for plaintiff. (Tr. 356-60). Dr. Langer found that plaintiff is

not significantly limited in his ability to remember locations and work-like procedures, to

understand and remember very short and simple instructions, to carry out very short and

simple instructions, to perform activities within a schedule, maintain regular attendance,

and be punctual within customary tolerances, to sustain an ordinary routine without

special supervision, to work in coordination with or proximity to others without being

distracted by them, to make simple work related decisions, to interact appropriately with

the general public, to ask simple questions or request assistance, to accept instructions

and respond appropriately to criticism from supervisors, to maintain socially appropriate

behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Tr. 356-57). He determined that plaintiff is moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id.). He concluded that plaintiff was able to understand and remember simple instructions, to complete simple, routine tasks, to sustain concentration for at least two hours in simple one and two step tasks, and to relate in a socially appropriate manner. (Tr. 358).

On May 20, 2010, Adrian Brown, Ph.D., evaluated plaintiff's medical records and completed a Psychiatric Review Technique (Tr. 66-67), an Assessment of Policy Issues (Tr. 67), a Mental Residual Functional Capacity ["RFC"](Tr. 68-69), and an Assessment of Vocational Factors (Tr. 70), before concluding that plaintiff was not disabled. (Tr. 71). He diagnosed plaintiff with affective disorders, anxiety disorders, and substance addiction disorders, and found the affective and anxiety disorders to be severe. (Tr. 66). He opined that these disorders result in a moderate restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Id.). He found that while plaintiff's impairments could reasonably be expected to produce his pain or other symptoms, plaintiff's statements about the intensity,

persistence, and functionally limiting effects of these symptoms were not substantiated by the objective medical evidence alone and he found plaintiff to be "[p]artially [c]redible[.]" (Tr. 67). When completing plaintiff's Mental RFC Assessment, he determined that plaintiff is moderately limited in his ability to understand, remember, and carry out detailed instructions and that he is only able to "understand and retain simple directives of [two] to [three] steps." (Tr. 68). He also found plaintiff to be moderately limited in his ability to maintain concentration and pace for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; he specified that plaintiff needs to be in a "setting that does not require strict adherence to time or production quotas." (Tr. 68-69).   He concluded that plaintiff was moderately limited in his ability to interact with the general public and to accept instructions and respond appropriately to criticism from supervisors, but noted that he "would do best in a non-public work env[ironment], where contact with others is superficial and infrequent and the need for collaboration is not required[,]" and that plaintiff "may be sensitive to criticism[.]" (Tr. 69). He also opined that plaintiff is moderately limited in his ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others, noting that plaintiff would be able to arrange for transportation to and from work and to avoid safety hazards in the work place, that he would not respond well to "abrupt, frequent, major changes in routine[,]" and "would need assistance setting simple work goals when initially getting acclimated to a new task[,]" but could adapt to minor changes in a work routine. (Id.). Dr. Brown ultimately

concluded that plaintiff was not disabled and could perform work as an addresser or a sticker. (Tr. 70-71).

On July 22, 2011, Whittlesey completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for plaintiff. (Tr. 419-21). She found that plaintiff had a mild limitation in his ability to make judgments on simple work-related decisions; moderate limitations in his ability to understand, remember, and carry out simple instructions; marked limitations in his ability to understand, remember, and carry out complex instructions, to make judgments on complex work-related decisions, and to interact appropriately with the public; marked to extreme limitations in his ability to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting; and an extreme limitation in his ability to interact appropriately with a supervisor. (Tr. 419-20). She based these opinions on plaintiff's history of frequently forgetting or showing up at the wrong time for appointments, his history of being unable to work for anyone other than some family members, his history of antisocial behavior and frequent violent fights, his diagnosed social phobia, and his long term imprisonment. (Id.). She noted that plaintiff's impairments were exacerbated when he uses illegal stimulants but that they were all still present to the "above-noted degree." (Tr. 420).

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75,

79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is currently employed, the claim is denied. Id. If the claimant is not working, as a second

step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV. DISCUSSION

Following this five step process, ALJ Thomas concluded that plaintiff was not under a disability since February 10, 2009, the date plaintiff filed his application. (Tr. 12).  He first found that plaintiff has not engaged in substantial gainful employment since February 10, 2009. (Tr. 14, citing 20 C.F.R. § 416.971 et seq.). ALJ Thomas then concluded that the medical evidence supports a finding that plaintiff has the following severe

impairments: affective disorder and anxiety disorder. (Id., citing 20 C.F.R. § 416.920). ALJ Thomas also concluded that plaintiff suffers from polysubstance dependence in sustained remission, a condition which previously impacted his ability to work; however, because plaintiff testified that he has been sober for three years and "because [his] polysubstance dependence does not affect [plaintiff's] ability to perform basic work activities," he found the condition to be non-severe. (Id.). In the third step of the evaluation process, ALJ Thomas concluded that plaintiff's impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I for the period of time in question. (Tr. 14-16, citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926). In addition, at step four, the ALJ found that plaintiff has the RFC to perform "a full range of work at all exertional levels[.]" (Tr. 16-19). ALJ Thomas added the additional restriction that plaintiff "is limited to jobs involving simple, routine, repetitive tasks with short simple instructions and few workplace changes; frequent interaction with supervisors; occasional superficial interaction with coworkers; no interaction with the public; and no high paced production demands." (Id.).  Finally, ALJ Thomas concluded that given plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. (Tr. 19-20, citing 20 C.F.R. §§ 416.969, 416.969(a)).

Plaintiff seeks an order reversing or remanding the decision of the Commissioner; he claims that the ALJ erred because: there is substantial evidence in the record to support a finding that plaintiff cannot work (Dkt. #16, Brief at 13-16); the ALJ had no basis for his RFC finding of mental impairments and so failed to meet his burden of proof (id. at 16-28); the ALJ erred by using outcome-driven selectivity and by making further errors (id. at 28-35); and the ALJ erred in failing to write an intelligible credibility finding

and based his finding on impermissible presumptions (id. at 35-39; see also Dkt. #22, at 1-7).

Defendant counters that the ALJ did not err in assessing plaintiff's severe impairments (Dkt. #19, Brief at 7-8); the ALJ's RFC determination is supported by substantial evidence (id. at 8-12); the ALJ properly weighed the "other source" opinion of Whittlesey (id. at 12-15); and substantial evidence supports the ALJ's assessment of plaintiff's credibility (id. at 15-19).

### A. WHETHER THERE IS SUBSTANTIAL EVIDENCE THAT PLAINTIFF CANNOT WORK

Plaintiff argues that the ALJ erred because there is substantial evidence in the record to support a finding that plaintiff cannot work. (Dkt. #16, Brief at 13-16). Defendant responds by correctly pointing out (Dkt. #19, Brief at 6-7) that the relevant standard is whether substantial evidence supports the ALJ's finding that plaintiff was not disabled, not whether substantial evidence shows that plaintiff is disabled. See Balsamo, 142 F.3d at 79.

### B. SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ ignored his severe impairment of characterological or personality disorder. (Dkt. #16, Brief at 27-28). However, plaintiff provides no support for why this impairment should have been considered severe; instead, he merely states that "[p]ersonality disorder is a severe mental impairment[]" and references the definition of the disorder. (Id. at 27, citing id. at 4-5, n.1). Plaintiff cites to five pages in the record to show that he was diagnosed with a characterological or personality disorder. (Id. at 27). Of these five citations, only one explicitly diagnoses plaintiff with a personality disorder (Tr. 380), the remaining four citations include a Mental Health Assessment with a note to

rule out a diagnosis of personality disorder (Tr. 267), two Progress Notes that explain that there is a characterological component to plaintiff's depression (Tr. 303, 304), and one Progress Note that discusses plaintiff's depression but makes no reference to a characterological or personality disorder. (Tr. 367). "The mere diagnosis of an impairment 'says nothing about the severity of the condition.'" Burrows v. Barnhart, No. 03 CV 342(CFD)(TPS), 2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007), citing Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988). Therefore, there was substantial evidence for the ALJ to find that plaintiff did not meet his burden of proving that his personality disorder was a severe impairment.

### C. WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S RFC

Plaintiff argues that the ALJ's RFC analysis is flawed because there is no evidence in the record to support it. (Dkt. #16, Brief at 16-28). Specifically, he claims that one of the state agency consultants, Jon Perlman, Ed.D., does not qualify as an expert (id. at 17), that the opinion of the other state agency consultant, Adrian Brown, Ph.D., is internally inconsistent and ignored medical evidence central to the case (id. at 18-19), that the opinions of both of the state agency consultants were improper because there was later submitted medical evidence that they did not consider (id. at 19-21), that the ALJ incorrectly determined that plaintiff's RFC allowed for him to have frequent interaction with supervisors (id. at 21-22), and that the ALJ incorrectly evaluated the opinions of the state agency consultants. (Id. at 22-26).

Plaintiff argues that the ALJ erred by assigning "great weight" to the opinions of Drs. Perlman and Brown because the record contains later submitted evidence that they did not review when making their determinations. (Dkt. #16, Brief at 19-21). This later

submitted evidence consists of thirty-two pages of medical records and a three page Medical Source Statement of Ability to Do Work-Related Activities, completed by Whittlesey. (Tr. 386-421). Defendant argues that this later submitted evidence is not significant, that the ALJ properly afforded Whittlesey's opinion some weight, and that "even i[f] the ALJ had afforded undue weight to Dr. Brown's opinion, remand would not be warranted because 'application of the correct legal standard could lead to only one conclusion.'" (Dkt. #19, Brief at 9-10, citing Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010)).

In Payne v. Astrue, No. 10 CV 1565 (JCH), 2011 WL 2471288 (D. Conn. June 21, 2011), (now Chief) U.S. District Judge Janet C. Hall found that the ALJ erred when he relied upon the reports of two non-examining doctors to make his determination about plaintiff's limitations when the non-examining doctors did not have access to all of plaintiff's medical records, including MRI, electromyography, and radiology reports. Id. at *7-8.  Judge Hall held that "[a]n ALJ should not place substantial weight on the opinion of a consulting doctor who has not considered significant diagnostic evidence."  Id. at *7, citing Burgess v Astrue, 537 F.3d 117, 132 (2d Cir. 2008).

As just indicated, the evidence here that the two non-examining doctors did not review consists of thirty-two pages of medical records and a three page Medical Source Statement of Ability to Do Work-Related Activities. (Tr. 386-421). The medical records document plaintiff's treatment from May 21, 2010 until May 27, 2011 and, similar to plaintiff's earlier medical records, show that plaintiff suffered from depression, problems sleeping, and some suicidal ideation, and that he consistently missed appointments. (Tr.

386-418).[6] During this time, plaintiff reported some improvements in his sleeping (Tr. 405, 406, 408) and some decrease in the frequency of his negative thoughts. (Tr. 408). However, plaintiff was also diagnosed with the additional impairment of social phobia (Tr. 387, 406),[7] was assigned a GAF score of 45 on two separate occasions (Tr. 387, 390), and was instructed to begin taking Celexa again. (Tr. 392).[8] He reported that he left his brother's wedding prematurely due to his social phobia (Tr. 407), that he attempted to take his family out to dinner for the first time in years and ended up getting into a fight with someone "who he thought was staring at him" (Tr. 412), and that he was "[v]ery afraid of the end of the world" because of the recent tsunamis and earthquakes. (Tr. 415).

In the Medical Source Statement of Ability to Do Work-Related Activities, Whittlesey found that plaintiff has a mild limitation in his ability to make judgments on simple work-related decisions; moderate limitations in his ability to understand, remember, and carry out simple instructions; marked limitations in his ability to understand, remember, and carry out complex instructions, to make judgments on complex work-related decisions, and to interact appropriately with the public; marked to extreme limitations in his ability to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting; and an extreme limitation in his ability to interact appropriately with a supervisor. (Tr. 419-20). She based these opinions on plaintiff's history of frequently forgetting or showing up at

---

[6]During this time, plaintiff was also seen at Sharon Hospital for lower back pain on July 27, 2010. (Tr. 388-89).

[7]See note 5 supra.

[8]Plaintiff's Celexa dosage was later increased during this time period. (Tr. 396).

the wrong time for appointments, his history of being unable to work for anyone other than some family members, his history of having antisocial behavior and frequently engaging in violent fights, his diagnosed social phobia, and his long term imprisonment. (Tr. 420). She noted that plaintiff's impairments were exacerbated when he uses illegal stimulants but that they were all still present to the "above-noted degree." (Id.).

Contrary to defendant's claims, the later submitted evidence is significant. While these records show that plaintiff continued to suffer from many of the same afflictions and that his medications began to improve his sleep (Tr. 405, 406, 408), they also show that plaintiff was further diagnosed with social phobia (Tr. 387, 406),  was assigned a GAF score of 45 on two separate occasions (Tr. 387, 390), was instructed to begin taking Celexa again (Tr. 392), and that his Celexa dosage was later increased. (Tr. 396). These records also contain anecdotal evidence reported by plaintiff about having to leave his brother's wedding early due to his social phobia (Tr. 407), attempting to take his family out to dinner for the first time in years and getting into a fight with someone "who he thought was staring at him" (Tr. 412), and being "[v]ery afraid of the end of the world" because of the recent tsunamis and earthquakes. (Tr. 415). It is not clear whether Drs. Perlman and Brown would have reached the same conclusions if they had the benefit of these additional medical records when making their determinations.[9]

---

[9]The ALJ briefly discussed plaintiff's low GAF scores in his decision and attributed them to "temporary exacerbations of symptoms that led evaluators on intake to assign a [GAF] scores of 55 and 45[.]" (Tr. 17). However, while the GAF of 55 assigned at the South County Psychiatric and Psychotherapy Center on April 8, 2009 (Tr. 377) and the GAF of 45 assigned at CMHA on November 13, 2009 (Tr. 371) both came upon, or shortly after, plaintiff's initial visits to the facilities, the two GAF scores of 45 that were assigned at the CMHA on May 21, 2010 (Tr. 387) and August 31, 2010 (Tr. 390) came after plaintiff had been in treatment there for several months, not upon intake. Furthermore, regardless of the ALJ's reference to these scores, Drs. Perlman and Brown did not have access to the information when analyzing plaintiff's conditions.

Similarly, despite the fact that the ALJ only afforded Whittlesey's opinion "some weight[,]" as discussed further in Section IV.D infra, it is not clear if Drs. Perlman and Brown would have altered their determinations if they had Whittlesey's findings before them.  Whittlesey was designated as plaintiff's "Primary Staff Member" at CMHA (Tr. 386, 391) and saw plaintiff consistently between February 2010 and May 2011 (Tr. 361, 387, 390, 405, 406, 407, 408, 412, 415, 416, 417, 418), before filling out his Medical Source Statement of Ability to Do Work-Related Activities on July 22, 2011. (Tr. 419-21). She found that plaintiff has a number of "marked" to "extreme" impairments in his ability to do work related activities, that he frequently forgets appointments or shows up at the wrong time, that "[b]y history, he is unable to work for anyone other than some family members[,]" and that his "[i]mpairments [are] exacerbated (by history) when [he] uses illegal stimulants but [they are] still present to the above noted degree." (Tr. 419-20). Therefore, the ALJ erred by placing "great weight" on the opinions of consulting Drs. Perlman and Brown because they had not considered significant evidence.[10]

D. ALJ'S COMPLIANCE WITH SSR 06-3P

Plaintiff alleges that the ALJ did not comply with Social Security Ruling ["SSR"] 06-03p by not affording appropriate weight to the opinion of Whittlesey, who was plaintiff's therapist. (Dkt. #16, Brief at 22-27). Defendant contends that the ALJ considered Ms.

---

[10]Because the Court has determined that the ALJ erred by placing great weight on the opinions of Drs. Perlman and Brown when they had not reviewed all of plaintiff's medical evidence, there is no need to address plaintiff's arguments that Dr. Perlman does not qualify as an expert (Dkt. #16, Brief at 17), that Dr. Brown's opinion was internally inconsistent and ignored medical evidence central to the case (id. at 18-19), that the ALJ incorrectly determined that plaintiff's RFC allowed for him to have frequent interaction with supervisors (id. at 21-22), and that the ALJ incorrectly evaluated the opinions of the state agency consultants. (Id. at 22).

Whittlesey's opinion and was correct to not afford it controlling weight. (Dkt. #19, Brief at 12-15).

The purpose of SSR 06-3p is to "clarify how we consider opinions from sources who are not 'acceptable medical sources[.]'" SSR 06-03p, 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006). SSR 06-3p explains that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." Id. at *3. Therefore, opinions from these sources, even though they do not qualify as "acceptable medical sources[,]" are "important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." Id. When analyzing these opinions from "other medical sources," SSR 06-03p directs ALJs to apply the same factors used to evaluate "acceptable medical sources" such as the length of the treating relationship and how frequently the source has seen the individual, the degree to which the opinion is consistent with other evidence in the record, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the individual's impairments, and any other factors that tend to support or refute the opinion. Id. at *4. In addition, these "[o]pinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and

physical and mental restrictions." Id. at *5. The ruling similarly explains that in some situations, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. Id. at *5-6.

The ALJ correctly noted that Whittlesey is a psychology clinician and does not qualify as an acceptable medical source who can give a medical opinion. (Tr. 18). He found that Whittlesey's opinion that plaintiff "is primarily limited in his interaction with others is generally consistent with the record." (Tr. 18-19). He similarly concluded that her opinion "lends support to the conclusion that claimant would have difficulty with public interaction, more than occasional superficial contact with coworkers, and production quotas" and he assigned her opinion "some weight." (Tr. 19). Defendant claims that the ALJ only accepted and afforded this opinion "some weight to the extent that it further supported his . . .  findings that plaintiff would experience difficulty getting along with others[,]" but that he "did not accept the levels of limitation she assessed." (Dkt. #19, Brief at 14-15).

The ALJ's decision to assign only "some weight" is not, in itself, a mistake. The ALJ is free to discount the assessments of "other medical sources" when making his determination, "however the ALJ must explain that decision." Saxon v. Astrue, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011); see also Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 344-45 (E.D.N.Y. 2010); see also Tolliver v. Astrue, No. 12-CV-042S, 2013 WL 100087, at *3 (W.D.N.Y. Jan. 7, 2013). Although the ALJ found Whittlesey's opinion that plaintiff "is primarily limited in his interactions with others [to be] generally consistent with the record" (Tr.18-19), there is no indication that he considered whether Whittlesey's

36

opinions about the severity of and reasons for plaintiff's impairments were also consistent with the record or that he weighed any of the remaining five factors specified in SSR 06-03p. Instead, it appears that the ALJ largely disregarded Whittlesey's opinion simply because it is not an accepted medical source and only afforded her opinion "some weight to the extent that it further supported his . . . findings that plaintiff would experience difficulty getting along with others." (Dkt. #19, Brief at 14-15). The ALJ did not comment on the fact that Whittlesey was plaintiff's "Primary Staff Member" at CMHA (Tr. 386, 391) and saw plaintiff at least twelve times between February 2010 and May 2011. (Tr. 361, 387, 390, 405, 406, 407, 408, 412, 415, 416, 417, 418); see Tolliver, 2013 WL 100087, at *3 (finding the fact that plaintiff had seen an "other medical source" fourteen times between September 3, 2009 and December 14, 2010 to be "highly relevant information[]"). Therefore, upon remand, the ALJ shall properly demonstrate that he has weighed all of the factors listed above, such as treatment history.

### E. CREDIBILITY DETERMINATION

Plaintiff claims that the ALJ erred when assessing plaintiff's credibility because he drew negative inferences from the fact that plaintiff "did not receive medical treatment for a period of time[]" (Dkt. #16, Brief at 33-34), his  analysis was too vague (id. at 35-36), and his analysis included "impermissible or unsupportable reasons to conclude that [plaintiff] was not credible." (Id. at 36-39).

First, plaintiff claims that the ALJ erred by drawing negative inferences from his lack of consistent treatment. (Id. at 33-34). Specifically, the ALJ found that "[t]he fact that [plaintiff] would not attend appointments for significant periods creates an impression

that he did not believe that his condition was so severe as to require treatment." (Tr. 17).

Pursuant to SSR 96-7p:

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

1996 WL 374186, at *7-8 (S.S.A. July 2, 1996). The ALJ is correct that plaintiff frequently missed therapy appointments (See Tr. 378, 381-83, 394, 395, 397, 398, 399, 400, 402, 403); however, the ALJ's decision provides no evidence that he considered any information in the case record that would explain these infrequent visits. Plaintiff explained at the hearing that he sometimes missed his appointments because he lacked "ambition." (Tr. 38). Additionally, the record shows that plaintiff missed an appointment on February 16, 2009 because of a lack of transportation. (Tr. 331). Plaintiff's lack of transportation was also listed as a barrier to his treatment on May 21, 2010 and August 31, 2010. (Tr. 387, 390).[11] Therefore, the ALJ's credibility assessment was flawed because he violated SSR 96-7p by drawing a negative inference from plaintiff's irregular therapy attendance without first considering plaintiff's lack of ambition and transportation.[12]

### F. ALJ'S EVALUATION OF DR. STEPHENSON'S REPORT

Plaintiff argues that the ALJ erred when he discounted the opinion of consultative examiner, Dr. Stephenson (Dkt. #16, Brief at 26-27), because her conclusion that plaintiff

---

[11]Plaintiff's "malingering" was also noted to be a barrier to his treatment. (Tr. 390).

[12]Because the ALJ's credibility assessment violated SSR 96-7p, it is not necessary for the Court to address plaintiff's additional arguments that the credibility assessment was too vague (Dkt. #16, at 35-36) and that his analysis included "impermissible or unsupportable reasons to conclude that [plaintiff] was not credible." (Id. at 36-39).

would "have difficulty obtaining and maintaining employment[]" (Tr. 339-40) was "based in large part on the claimant's self-reported limitations and does not consider whether employment exists that entails very limited contact with others." (Tr. 18). The ALJ discounted plaintiff's "self-reported limitations" after conducting an improper credibility assessment (see Section IV.E supra); therefore, upon remand, the ALJ should reconsider the correct weight to assign to Dr. Stephenson's report after conducting a proper analysis of plaintiff's credibility.

### G. WHETHER THE ALJ EMPLOYED OUTCOME-DRIVEN SELECTIVITY

Plaintiff argues that the ALJ "employed outcome-driven selectivity or cherry picking" in his analysis. (Dkt. #16, at 28-35). Because the Court has already determined that a remand is appropriate to ensure that the ALJ correctly determines plaintiff's credibility and RFC, it is not necessary to address plaintiff's claims that the ALJ employed outcome-driven selectivity in his original analysis of plaintiff's credibility and in his RFC determination.[13]

### V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing (Dkt. #17) is granted in part such that the case is remanded for further proceedings consistent with Sections IV.C, D, E and F of this Recommended Ruling; and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #19) is denied in large part but granted in limited part.

---

[13]In this same section of his brief, plaintiff also alleges that the ALJ used an unexplained criteria to support his RFC (Dkt. #16, at 34) and that the ALJ contradicted himself. (Id. at 34-35). Because the ALJ will re-examine plaintiff's credibility and RFC it is not necessary to address these arguments.

The Clerk's Office is instructed that if any party files an appeal in this district court following the administrative decision made upon remand, any subsequent appeal initially is to be assigned to this Magistrate Judge, and then to the District Judge who issued the final Ruling that remanded the case.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a), 6(e), & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated this 18th day of November, 2014 at New Haven, Connecticut.

Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge